ent when John A. Flannery wrote the application; that the insured was not; but she does not state whether Wheaton was present. She testified that John A. Flannery wrote the application without asking her a question, and she also testified that the examining physician and Austin Flannagan were together at her house on the following Sunday, and that she saw her brother sign papers. The certificate of the medical examiner is dated April 6, 1890, which was Sunday; but the application of Austin Flannagan is dated April 7, 1890, which was on Monday, and is witnessed by "J. A. Flannery, Solicitor." The presumption is that these papers were executed when dated. There is no evidence in the case tending to show that the application of the insured, executed April 7, 1890, was not read to him. The presumption is that a person able or unable to read, who executes a contract, knows its contents, and it will not do to hold that because a person is unable to read a contract the presumption is that he was unacquainted with its contents. The evidence fails to show that the defendant's agent practiced any fraud in procuring this application. It is evident that the mother, sister, and aunt thought that it was desirable to have the life of Austin Flannagan insured, and that the defendant's agent was anxious to issue as many policies on the life as he could. No question of fact was presented by the evidence, and the nonsuit was properly granted.

The judgment should be affirmed, with costs. All concur.

---

(16 App. Div. 1.)

TAYLOR v. LONG ISLAND R. CO. et al.

(Supreme Court, Appellate Division, Second Department. April 13, 1897.)

1. NEGLIGENCE—CARELESS DRIVING.
    The owner of a wagon is liable for injuries caused by the negligence of the driver in going on a railroad track in front of an approaching train, whereby the wagon is struck and thrown against a person near the crossing.

2. RAILROADS COMPANIES—DEFECTIVE CROSSINGS.
    A railroad crossing is not defective because the plank which forms the approach is raised above the surface of the ground about the thickness of the plank.

3. SAME—ABSENCE OF FLAGMAN—EVIDENCE.
    A finding that a flagman was not at the crossing at the time of the accident is not sustained by the evidence, where six witnesses testified that they saw the flagman on the crossing giving the signal, while two other witnesses testified that they did not see him at the time, and another witness testified that the flagman was not there.

4. DEATH—EXCESSIVE DAMAGES.
    A verdict for $10,000 for the death of a laborer 53 years old, and earning $2.50 a day, is excessive.
    Bartlett, J., dissenting.

Appeal from trial term, Kings county.

Action by Eliza Taylor, as administratrix of Isaac S. Taylor, deceased, against the Long Island Railroad Company and the New York & Brooklyn Brewing Company, to recover damages for the death of plaintiff's intestate, alleged to have been caused by defendants' negligence. From a judgment for $10,000 damages and $11,-

197.54 costs, and from orders denying defendants' several motions for a new trial, defendants appeal.    Reversed.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and BRADLEY, JJ.

William J. Kelly, for appellant railroad company.
John C. Judge, for appellant brewing company.
J. C. Bushby, for respondent.

HATCH, J.   The injury which is the cause of this action was received by plaintiff's intestate, at a crossing of defendant's railroad on Enfield street, at its junction with Atlantic avenue, in the city of Brooklyn.   The track of the railroad at this point is straight, nearly or quite level; and from the crossing, looking in the direction from which the train came, there is no obstruction for nearly or quite two miles, and a train can be seen for a long distance.   The accident happened between 5 and 6 o'clock on the evening of November 4, 1895.   The circumstances attending the accident were these:   A driver and helper of the brewing company were in charge of one of its wagons or trucks, engaged in delivering ale to customers.   The truck at the time was loaded with three hogsheads of ale, weighing about 850 pounds each, three empty hogsheads, and one empty barrel.   It was being driven along Atlantic avenue, west of the crossing.   The avenue runs parallel with the railroad.   Atlantic avenue was in bad condition at this point, and the truck became stuck in a rut about 200 feet west of the crossing.   The driver of the team alighted from the wagon, leaving the helper in charge of the reins. The former dug away the sand from in front of the wheels, and then whipped up the horses, which pulled the wagon from the rut and went along at quite a rapid rate, in charge of the helper.   The horses went faster than the driver, who fell behind the wagon; and the helper continued to drive them along at quite a rapid pace until he reached the crossing, when he suddenly turned the team to pass over the tracks.   At this time plaintiff's intestate, together with other persons, was standing upon an open platform, waiting to take passage upon a way train which stopped at the platform.   The railroad has a double track, and at this time there was approaching the crossing, running at a high rate of speed, a through train, which did not stop at this platform.   As the wagon turned to pass over the crossing, this train was distant about 750 feet.   The headlight upon the engine was lighted, and plainly visible to any one who looked in that direction.   The horses passed over the first track, but the truck was still upon it when the engine reached and crashed into it, killing the man upon the truck, and throwing its load upon the platform; and the hogsheads, coming in contact with plaintiff's intestate, produced his death.   The evidence was abundant in establishment of the negligence of the man then driving the horses.   Indeed, the jury were authorized to find from it that he drove upon the track in utter disregard of any precaution, and with no attempt to inform himself of the existing conditions, which were plainly visible.   The court was clearly right in submitting the question of the brewery com-

pany's negligence to the jury, as the proximate cause of the accident, and the finding of the jury in that regard is abundantly supported by the testimony. No question of contributory negligence upon the part of plaintiff's intestate enters into the case, and, as to the brewery company, a recovery of some damages should be upheld.

Upon the question of the negligence of the railroad company, a different question is presented. It is quite evident, as to it, that the mind of the learned trial judge wavered in the balance respecting its liability for the accident and consequent injury. There was some contention made upon the trial, and the point is now urged upon our consideration, that negligence of the railroad company could be predicated upon a defect in the crossing. But we agree with the learned court below that the evidence was insufficient for that purpose. The claim is that the plank which formed the approach to this crossing was raised above the surface of the ground about the thickness of the plank itself, and that the right hind wheel of the wagon caught upon it. One witness makes this statement, and he did not notice it until the morning after the accident. The soil at this place is composed of loose sand. The planks themselves were firmly set, and were solid and in good condition. The rise in the plank above the surface of the soil was slight, and we think that the fact that the soil did not come up even with the plank, the distance being so slight, was not such a defect in the approach to the crossing that negligence can be predicated upon it, or that the defendant owed any further duty in this regard to persons making use of the crossing, or others. Extraordinary care would hardly suffice to keep the surface of the ground even with the plank, and ceaseless vigilance in precaution could scarcely foresee that an accident would happen from such a cause. Upon the question of defendant's negligence, the learned court below submitted but two considerations upon which it could be based, and these were: Whether the flagman was on duty at the time when the truck reached the crossing and started to pass over? If he was absent, did such absence contribute to the injury? Upon both of these propositions the plaintiff held the affirmative, and was bound to establish the same by a fair preponderance of testimony. We are now to see if this submission was warranted by the evidence. The case of the plaintiff rests upon the testimony of one witness, Kreig; and he, in view of all the conceded circumstances, relates a somewhat improbable story. He located the spot where the truck was struck at a place considerably different from the other witnesses, including the driver. And he states that Ryan, the driver, walked behind the wagon after it started, but came up and walked to the front of the horses before the truck was struck. Ryan, concededly, did not reach the crossing until after the disaster. Kreig states that he saw no light from the train when the horses passed onto the track, and further states that he did not then see any flagman at the crossing; and, again, that no flagman was there, and that he did not come out until the engineer blew the whistle on the engine. Again, he says that the flagman came out and said to the driver: "Go back. There was a through train coming." Again, he says of the flagman: "I can't

say that he did anything. I simply saw that he was discussing around with the driver there." Ryan states that he was about 60 feet behind the wagon; that he did not see any flagman or any light, and did not see any signal given by the flagman to the driver. He did not see the headlight of the engine, as the truck obscured his view. He said the truck was then standing, but did not see that the wheels were caught on anything. Said it might have stood a minute, or half a minute; that time was all guesswork, as it all happened very quickly. Kreig was back about where Ryan was, possibly 10 or 15 feet in front of him. We are not to shut our eyes to conceded facts and circumstances, nor are we to fail in giving to such facts due weight, and draw therefrom such inference as appeals to our common knowledge and corresponds with ordinary physical phenomena. When this truck passed upon this track the headlight of the engine was visible to any one who looked. It was a little hazy, but there was nothing in atmospheric conditions which greatly interfered with the sense of vision. The light was plainly visible to those upon the platform, casting its rays with blinding force. The space of time which intervened between the placing of the truck upon the track and its collision with the engine was not measured by minutes. It was reduced to seconds, and few at that. Opportunity to see was limited for the most part to the main things,—the truck upon the track and the rushing train. People looking to see must have seen these, and, in the main, their relative positions. And when one looking can see a man, and not the headlight of an engine in plain view, what he claims to see is discredited. With these observations we are prepared to measure the testimony of the witness Kreig, who is the only witness who testifies that the flagman was not upon the crossing, with the other testimony in the case. Page, the flagman, testified that he was upon the crossing with his light, and saw the approaching train before the horses came upon the crossing; that they came upon the track with a jump; and that he swung his lamp and "hollered" until he was in jeopardy of his own life, from the train; but that the horses came on, and were in motion when the engine struck the truck. Spence, one of the witnesses who was waiting at the platform to take the train, testified that he saw the truck stuck in the sand; that he saw the horses start up the road moving rapidly, and turn onto the track in the path of the engine; that he then saw the train coming, thought the team could not get away from the accident, and he jumped the fence to get out of the way. He first saw the flagman in his box, lighting his light, and made an inquiry about when a train would arrive, and saw him before the collision between the tracks. Emma Dove, also a passenger at the platform, testified that she saw the headlight of the train at Woodhaven, a considerable distance above; that she saw the team come down onto the track on a gallop; that the flagman was on the crossing, had a white light, and shouted to "Get back"; that at this time the bell upon the engine was ringing and the headlight was shining. Miller, the relief flagman, was in the shanty box. He testified that the flagman was outside, upon the crossing. He did not see the collision, but heard the noise. Parsons, the engineer of

the train, testified that he saw the flagman swing a white light, which was the signal for him to come on; that he was then running about 25 miles an hour,—regular schedule time. Shortly after he saw the team come upon the crossing quite lively, and immediately used all the appliances to stop the train, but was unable to prevent the collision. Braid, the fireman upon the engine, testified that he saw the flagman upon the crossing, and saw him give the signal with his light to come ahead, and shortly after the horses came upon the track.. Both the engineer and fireman testified that, if they had not received the signal, it would have been their duty to stop. Mrs. Peterson, a passenger at the platform, testified that she saw the flagman in his box, and spoke to him about the train; that she did not afterwards see him upon the crossing, or after that. She turned her head away to avoid the light of the engine, and states that she did not hear the whistle blow or the bell sound. It was not disputed by any testimony but that these signals were given. We have, therefore, as a result of the nine witnesses, six who saw the flagman upon the crossing giving the signal, and who testify to the reckless conduct of the man in charge of the truck; one who testifies that the flagman was not there; and two who testify that they did not see him. As to the last two, when connected with the circumstances of this case, the testimony is of that negative character which does not avail to overcome the positive testimony of the other witnesses in the case, and therefore falls directly within the decision of Culhane v. Railroad Co., 60 N. Y. 137. As to the testimony of Kreig, we think that it is fairly overcome by the testimony of the other witnesses in the case, and that to give force to it is to disregard the overwhelming weight of the testimony. We are therefore of opinion that the court erred in submitting the question of the negligence of the railroad company to the jury. Its motion for the direction of a verdict made at the close of the case should have been granted. There is strong reason for saying that, even though the flagman was absent from the crossing, still that such absence was not a proximate cause of the accident. But we rest our decision upon the other ground, as above stated, and do not find it now necessary to express an opinion upon the latter subject.

But, while we reach the conclusion that a cause of action was made out against the brewing company, we also reach the conclusion that the damages awarded are excessive. Deceased was 53 years of age, in good health, and received as wages $2.50 a day. If he earned at this rate for each workingday in the year, he would earn $780 a year. Taking into consideration his probable duration of life, and his ability to earn continuously, which could not increase, but would certainly diminish, the sum which his family would receive as a result of his earnings after the cost of his own living was deducted, and we can readily see that the pecuniary loss to the next of kin is more than covered by the sum which is rendered. Our views upon these questions have been so frequently expressed that no further elaboration is needed. We have concluded that the measure of pecuniary loss will be fairly and liberally met by reducing this recovery to the sum of $7,500. The judgment should there-

fore be that as to the brewing company the judgment is reversed, unless plaintiff stipulates within 20 days to reduce the recovery to the sum of $7,500, together with a proportionate amount of the extra allowance; and, if plaintiff so stipulates, the judgment as modified is affirmed, with costs.    As to the defendant the Long Island Railroad Company, the judgment should be reversed and a new trial granted; costs to abide the event.

All concur, except BARTLETT, J., who dissents as to reduction only.

(15 App. Div. 588.)

CONEY ISLAND, FT. H. & B. R. CO. v. KENNEDY et al.

(Supreme Court, Appellate Division, Second Department.    April 13, 1897.)

1. STREET RAILROADS—WHEN FRANCHISE BECOMES COMPLETE.
    The franchise of a street-railroad company becomes complete when the consents of the local authorities and of the abutting property owners are obtained.

2. SAME—EFFECT OF SUBSEQUENT LEGISLATION.
    A street-railroad franchise, after it has become complete, cannot be destroyed by subsequent legislation, except by the exercise of the power of eminent domain.

3. SAME—FORFEITURE OF FRANCHISE—FAILURE TO CONSTRUCT ROAD.
    Laws 1892, c. 676, § 99, as amended by Laws 1893, c. 434, making it a cause of forfeiture not to complete a road within three years after obtaining the necessary consents, does not ipso facto dissolve the corporation on noncompliance.

4. SAME—CONSTRUCTION IN PARK.
    Laws 1892, c. 676, § 108, forbidding the construction of surface railroads in public parks, does not apply to a park laid out after a railroad franchise has been acquired.

Appeal from special term, Kings county.